IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

―――――――――――

No. 95-10327

―――――――――――

In The Matter Of:  T.F. Stone Company, Inc.,

                                        Debtor.

T.F. STONE COMPANY, INC.,

                                        Appellant,

                        versus

LUCY HARPER, County Treasurer
of Bryan County, Oklahoma

                                        Appellee.


―――――――――――

Appeal from the United States District Court
for the Northern District of Texas

―――――――――――

December 28, 1995

Before REAVLEY, HIGGINBOTHAM, and BARKSDALE, Circuit Judges.

HIGGINBOTHAM, Circuit Judge:

    This appeal raises the question whether a peppercorn price received in a noncollusive, lawfully conducted tax foreclosure sale of the real property of a Chapter 11 debtor can constitute "present fair equivalent value" within the meaning of § 549(c) of the Bankruptcy Code, 11 U.S.C. § 549(c).  T.F. Stone Companies, Inc., a reorganized debtor in possession, sought a money judgment in bankruptcy court against the Treasurer of Bryan County, Oklahoma, claiming that Bryan County's postpetition tax foreclosure sale of Stone Companies' land was unauthorized and for insufficient value.

The bankruptcy court granted summary judgment for the Treasurer, and the district court affirmed. Stone Companies appeals. We agree with the lower courts that because the tax sale was noncollusive and complied with Oklahoma law, it was "for present fair equivalent value" as required by § 549(c). We affirm.

I.

In July 1985, T.F. Stone Companies, Inc., acquired title to approximately five acres of land in Bryan County, Oklahoma. On July 3, 1989, Stone Companies petitioned for Chapter 11 bankruptcy, listing the Oklahoma property in its schedule of assets at a value of $65,000. Though Stone Companies failed to pay ad valorem taxes on the Oklahoma property for 1989, it did not list Bryan County as a creditor on its schedules and never filed notice of its bankruptcy in Bryan County.

On October 1, 1990, the County Treasurer of Bryan County, Lucy Harper, conducted a tax foreclosure sale of the Oklahoma property in an attempt to satisfy Stone Companies' delinquent tax obligation, as authorized under Oklahoma law. See Okla. St. Ann. tit. 68 §§ 3105 & 3107. No bids were tendered at this tax sale, so title to the Oklahoma property was deemed transferred to Bryan County. See Okla. St. Ann. tit. 68 § 3108.[1] During the two years after Bryan County took title to the Oklahoma property, Stone

_____

[1]Under § 3108, a county treasurer may "bid off" property in the amount of taxes due, giving the county the legal and equitable rights of a purchaser. Bryan County's bid off memorialized a lien on the Oklahoma property for taxes due at that time.

Companies had a right to redeem the Oklahoma property by satisfying its outstanding tax debt. See Okla. St. Ann. tit. 68 § 3113. Stone Companies did not exercise this right, however, and did not pay ad valorem taxes on the Oklahoma property for 1990, 1991, or 1992.

On June 14, 1993, Bryan County conducted a "Tax Resale" of the Oklahoma property and sold it to Dickie and Carolyn Kidd for $325, which was used to satisfy Stone Companies' delinquent tax debt. See Okla. St. Ann. tit. 68 § 3125 (providing for resale of unredeemed properties after two-year redemption period). This resale to the Kidds extinguished Stone Companies' redemption right and thereby eliminated Stone Companies' remaining equity in the Oklahoma property. See Okla. St. Ann. tit. 68 § 3113.

On October 21, 1993, Stone Companies sued in bankruptcy court under § 549 of the Bankruptcy Code, 11 U.S.C. § 549, seeking to void the effects of Bryan County's acquisition of title to the Oklahoma property and subsequent resale to the Kidds as an unauthorized postpetition transfer. See In re T.F. Stone Cos., 170 B.R. 884 (Bankr. N.D. Tex. 1994). On January 6, 1994, however, Stone Companies repurchased the Oklahoma property from the Kidds for $39,500 and agreed to dismiss the Kidds from this litigation. Since Bryan County's resale to the Kidds was a transfer to a subsequent good faith purchaser, Stone Companies' repurchase of the Oklahoma property in January meant that its only remedy under the Bankruptcy Code was to pursue a money judgment from the "initial transferee" for the value of property improperly transferred. See

3

11 U.S.C. §§ 549(c) & 550.[2]  Stone Companies amended its complaint accordingly to seek recovery, under § 549 and § 550, of the value of the Oklahoma property from the Treasurer of Bryan County.

The Treasurer raised several affirmative defenses, including a claim that the deemed transfer to Bryan County and subsequent resale to the Kidds could not be avoided under § 549(c) because these transactions produced a transfer to a "good faith purchaser without knowledge of" Stone Companies' bankruptcy and "for present fair equivalent value."  The bankruptcy court granted summary judgment for the Treasurer on the basis of this § 549(c) defense, denying recovery to Stone Companies.  The district court affirmed.


II.

A trustee in bankruptcy — or, in a Chapter 11 case, a debtor in possession — may avoid an unauthorized postpetition transfer under § 549(a) of the Bankruptcy Code, 11 U.S.C. § 549(a), subject to certain exceptions set forth in the Code.  One such exception provides:  "The trustee [or debtor in possession] may not avoid . . . a transfer of real property to a good faith purchaser without knowledge of the commencement of the case and for present

_____

[2]Section 550(a) provides:  "Except as otherwise provided in this section, to the extent that a transfer is avoided under section . . . 549 . . . of this title, the trustee may recover, for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property, from — (1) the initial transferee of such transfer or the entity for whose benefit such transfer was made . . . ."  The bankruptcy court determined that Bryan County became the "initial transferee" when it acquired title to the Property at the original October 1990 tax foreclosure sale, prior to the resale to the Kidds.  Bryan County has not challenged that determination on appeal.

4

fair equivalent value . . . ." § 549(c). The Treasurer concedes that Bryan County's postpetition sale of the Oklahoma property to the Kidds, in extinguishing Stone Companies' right under Oklahoma law to redeem the Oklahoma property, effectuated an unauthorized transfer of the Oklahoma property within the meaning of § 549(a). Stone Companies in turn concedes that Bryan County and the Kidds transacted in good faith and without knowledge of Stone Companies' bankruptcy. The parties thus agree that the sole question in this appeal is whether the transfer completed via Bryan County's initial acquisition of the Oklahoma property in October 1990 and subsequent resale to the Kidds for $325 in June 1993 was a transfer made "for present fair equivalent value."

To answer this question, we must determine the applicability of the Supreme Court's recent decision in BFP v. Resolution Trust Corp., 114 S. Ct. 1757 (1994). The Court decided BFP on May 23, 1994, after Stone Companies filed this suit but before the bankruptcy court disposed of Stone Companies' claims. BFP involved a prepetition mortgage foreclosure sale of a home previously owned by BFP, a Chapter 11 debtor in possession. BFP's mortgage creditor had sold the home for $433,000 shortly before BFP's bankruptcy petition. BFP sued to avoid the transfer under § 548 of the Bankruptcy Code, 11 U.S.C. § 548, alleging that the property was worth over $725,000 at the time of the foreclosure sale, and that therefore the prepetition transfer was avoidable under § 548(a) because BFP "received less than a reasonably equivalent value in exchange for [the] transfer or obligation." § 548(a)(2)(A). The

5

issue before the Court was whether the $433,000 obtained at the foreclosure sale satisfied this § 548 requirement that a transfer be made for "reasonably equivalent value."  The Court, per Justice Scalia, held 5-4 "that a fair and proper price, or a `reasonably equivalent value,' for foreclosed property, is the price in fact received at the foreclosure sale, so long as all the requirements of the State's foreclosure law have been complied with."  BFP, 114 S. Ct. at 1765.

In the case before us, while the bankruptcy court acknowledged that BFP addressed § 548's requirement of "reasonably equivalent value" in the context of a prepetition mortgage foreclosure sale, it relied on BFP in determining that Bryan County's postpetition tax foreclosure sale of Stone's land satisfied the requirement under § 549 that a transfer be "for present fair equivalent value." The bankruptcy court concluded that "[t]he price obtained at a non-collusive tax foreclosure sale, conducted in accordance with all state laws, presumptively meets the `present fair equivalent value' standard in § 549(c)."  In re T.F. Stone, 170 B.R. at 892.  The district court agreed that "the reasoning of BFP should be applied in the context of tax foreclosures," and concluded that "therefore, BFP controls the issue presented in the case at hand."

On appeal, Stone Companies challenges the conclusions of the lower courts on two grounds.  First, Stone Companies contends that the proceeds from Bryan County's sale of the Oklahoma property were used to satisfy Stone Companies' antecedent tax debt and therefore do not qualify as "present" value for purposes of § 549(c)'s

6

requirement of "present fair equivalent value."  Second, Stone Companies argues that BFP is distinguishable from this case and thus ought not guide our § 549(c) analysis.  We address each of these arguments in turn.

### III.

Stone Companies argues that because Bryan County used the $325 from the sale of the Oklahoma property as a credit against Stone Companies' outstanding tax debt on the Oklahoma property, the sale was in satisfaction of antecedent debt and therefore did not yield "present fair equivalent value" as required by § 549(c).  "Antecedent" debt refers to debt incurred before the debtor's insolvency.  According to Stone Companies, federal courts have historically viewed the bankruptcy laws' inclusion of the word "present" in the phrase "present fair equivalent value" as establishing that an amount used to satisfy antecedent debt cannot qualify as "value" received.  See, e.g., Kass v. Doyle, 275 F.2d 258, 262 (2d Cir. 1960) (holding that "liquidation of an antecedent debt" cannot be used to satisfy requirement of "present fair equivalent value" in § 70, sub. d of pre-Code Bankruptcy Act).  Stone Companies emphasizes that the bankruptcy courts have consistently embraced this understanding of "present" value in interpreting § 549(c)'s requirement of "present fair equivalent value."  See, e.g., Purnell v. Citicorp Homeowners Servs., Inc. (In re Purnell), 92 B.R. 625, 630 (Bankr. E.D. Pa. 1988) (explaining that "satisfaction of an antecedent debt has not been viewed as a

7

`present value'"); <u>Anderson v. Briglevich (In re Briglevich)</u>, 147 B.R. 1015, 1021 (Bankr. N.D. Ga. 1992) (holding that satisfaction of antecedent debt does not qualify as "present" fair value); <u>Davis v. Bank of Commerce (In re Wilson)</u>, 52 B.R. 637, 638 (Bankr. E.D. Tenn. 1985) (same). Stone Companies urges that a construction of § 549(c)'s "present fair equivalent value" language that excludes satisfaction of antecedent debt is essential to preserving the bankruptcy estate existing at the time of the bankruptcy petition.

We need not resolve this issue at this time. Even assuming that an amount used to satisfy antecedent debt cannot qualify as "present" value for purposes of § 549(c), this claim is unavailing to Stone Companies. Much of Stone Companies' tax debt arose from its failure to pay ad valorem taxes on the Oklahoma property for 1990, 1991, and 1992 — <u>after</u> its 1989 bankruptcy petition. Moreover, Tommy F. Stone himself suggested in an affidavit to the bankruptcy court that even the 1989 tax debt was postpetition debt: "In 1990 the Treasurer caused the Oklahoma property to be seized for the purposes of satisfying its claim against the Debtor arising from property taxes allegedly due on and secured by the Oklahoma property for tax year 1989 (which would be <u>taxes that accrued post bankruptcy</u>)." (emphasis added). In short, Bryan County used at least some, if not all, of the $325 received from the Kidds to liquidate Stone Companies' postpetition debt, not just its antecedent debt. Stated more directly, some, if not all, of the $325 tax credit conferred "present" value within the meaning of § 549(c).

8

Even if Stone Companies could show that Bryan County applied the $325 only to Stone Companies' antecedent tax debt, we would still have to consider whether BFP guides this case. As we will explain, the BFP Court's analysis of § 548 expressly eschewed any consideration of the substantive value received in a forced-sale context and instead pinned the validity of the transfer on whether the forced sale was noncollusive and conducted in compliance with state law. In other words, if BFP controls this case, a finding that Stone Companies received all its value as a credit against antecedent debt does not bar us from concluding that the tax sale satisfied § 549(c) on the ground that it was noncollusive and conducted in conformity with Oklahoma law.

IV.

Stone Companies contends that the Court's decision in BFP cannot govern this, a § 549 case, because BFP dealt with different language in a different Bankruptcy Code provision, in the context of a different kind of transfer. We disagree.

Our analysis starts with the statutory texts. While § 548 requires "reasonably equivalent value," § 549 demands "present fair equivalent value." Stone Companies contends that BFP's reading of "<u>reasonably</u> equivalent value" cannot control our construction of "<u>present fair</u> equivalent value," highlighting the following statement in BFP: "`[I]t is generally presumed that Congress acts intentionally and purposely when it includes particular language in one section of a statute but omits it in another,' and that

9

presumption is even stronger when the omission entails the replacement of standard legal terminology with a neologism.'" 114 S. Ct. at 1761 (quoting <u>Chicago v. Environmental Defense Fund</u>, 114 S. Ct. 1588, 1593 (1994)). This textual argument has some force. Though the Court invoked this proposition to explain why "reasonably equivalent value" cannot always be measured against "fair market value," we agree that Congress likely meant something different in § 549 when it used the language "present fair" instead of "reasonably."

We are unable, however, to perceive a meaningful difference between "reasonably" and "present fair" as applied in the context of this forced-sale case. Again, assuming that the word "present" in § 549(c)'s requirement of "present fair equivalent value" is intended to exclude satisfaction of antecedent debt, our determination that Stone Companies did receive "present value" in the form of a credit against its postpetition tax debt leaves us with a necessary comparison of "<u>reasonably</u> equivalent value" and "<u>fair</u> equivalent value." To be sure, the words "reasonably" and "fair" are nominally distinct, and may in some circumstances have divergent substantive meanings. Nevertheless, we think that in a forced-sale context, a value that is "reasonably equivalent" is also "fair equivalent," and vice versa. Indeed, the <u>BFP</u> Court used the words "reasonably" and "fair" in tandem, in such a manner as to belie the notion that they have different meanings. <u>See</u> 114 S. Ct. at 1765 ("[A] <u>fair</u> or proper price, or a `<u>reasonably</u> equivalent value,' for foreclosed property, is the price in fact received at

10

[a lawfully conducted] foreclosure sale . . . ."); id. at 1762 (expressing doubt as to whether courts can or should "judge there to be such a thing as a `reasonable' or `fair' forced-sale price").

Moreover, the Court's decision in BFP relied on intermediate principles that are directly applicable in determining whether a forced sale is made "for present fair equivalent value" as required by § 549. First, "reasonably equivalent value" in § 548 cannot be measured by reference to "fair market value," since Congress could have used the language of "fair market value" had it intended such a benchmark. Id. at 1761. Second, reference to the fair market value of real property is especially inappropriate in the context of a forced sale. Id. at 1761-62 ("Market value cannot be the criterion of equivalence in the foreclosure-sale context."). Third, any effort to ascertain what constitutes a "reasonable" or "fair" forced-sale price requires a policy judgment that courts ought not attempt. Id. at 1762 ("[S]uch judgments represent policy determinations which the Bankruptcy Code gives us no apparent authority to make."). Fourth, judicial interpretation of § 548 implicates an "essential state interest" in that "`the general welfare of society is involved in the security of the titles to real estate,' and the power to ensure that security `inheres in the very nature of [state] government.'" Id. at 1764-65 (quoting American Land Co. v. Zeiss, 219 U.S. 47, 60 (1911)).

These four principles are instructive in deciding this case. First, § 549(c)'s use of the phrase "present fair equivalent value" and its corresponding exclusion of "fair market value" rhetoric

11

raises at least a "suspicion," as Justice Scalia put it, "that fair market value cannot — or at least cannot always — be the benchmark" under § 549.  Id. at 1761.  Second, Bryan County's sale of the Oklahoma property to the Kidds was a forced sale — and "market value, as it is commonly understood, has no applicability in the forced-sale context; indeed, it is the very antithesis of a forced-sale value."  Id.  That Bryan County's sale to the Kidds was a tax sale rather than a mortgage foreclosure sale does not change the reality that it was a forced sale.

Third, any judicial effort to determine the purported content of "such a thing as a `reasonable' or `fair' forced-sale price," id. at 1762, would require policy judgments that are inappropriate for courts and fraught with the same difficulties in the context of both mortgage foreclosure sales and sales conducted to satisfy delinquent tax obligations.  Finally, the essential state interest in ensuring "security of the titles to real estate" is equally salient in both mortgage foreclosure sales and tax sales of real property.  A reading of § 549(c) that contemplated a substantive benchmark such as fair market value, however, "would have a profound effect upon that interest:  the title of every piece of realty purchased at foreclosure [or a tax sale] would be under a federally created cloud."  Id. at 1765.  Given the presumption against reading federal laws to impinge on traditional areas of state regulation in the absence of a clear and manifest statutory mandate, we find it inappropriate to adopt such an approach to our interpretation of § 549(c).

12

This case is illustrative of the BFP Court's teachings about the inappropriateness of using a fair-market-value benchmark as a federally imposed constraint on the ability of states to permit forced sales of real property. Bryan County itself was forced to take title to the Oklahoma property at the original tax foreclosure sale in October 1990 because there were no bids on the Oklahoma property. Given that this initial forced-sale value was apparently close to zero, it should not be astonishing that Bryan County was later able to sell the Oklahoma property for only $325.

We conclude that the logic of BFP trumps the differences between the relevant language of § 548(a)(2)(A) and § 549(c) and the contexts of mortgage foreclosure sales and tax sales. The only remaining distinction between § 548 and § 549 that mandates caution in extending BFP's analysis to this case is the fact that § 548 addresses prepetition transfers while § 549 governs postpetition transfers. Arguing against such an extension, Stone Companies contends that Congress intended a stricter standard under § 549 than under § 548. Stone Companies urges that "[t]he preservation of the bankruptcy estate is at the core of the `present fair equivalent value' standard," and that "the purpose of the more stringent statutory requirement in section 549 is to protect the estate of the debtor from depletion during the pendency of the petition."

That Congress intended stricter limitations on postpetition transfers, however, does not mean that such stringency must take shape in the "equivalent value" received by the bankruptcy estate.

13

In concluding that, under BFP, there is no meaningful difference between respective "equivalent value" requirements of § 548 and § 549 in a forced-sale context, we do not render § 549 less strict than § 548. Significantly, § 549(c) has requirements that are not present in § 548 — requirements that address particular concerns in the context of postpetition transfers. A postpetition transfer must do more than garner "present fair equivalent value"; it must also be made "to a [1] good faith purchaser [2] without knowledge of the commencement of the case." § 549(c). For whatever reason, Stone Companies declined to avail itself of a critical safeguard under § 549 when it never informed Bryan County of its bankruptcy. Stricter rules under § 549 exist — Stone Companies did not take advantage of them.[3]

We are mindful of BFP's caveat as to the narrow scope of its decision. Justice Scalia's majority opinion stated: "We emphasize that our opinion today covers only mortgage foreclosures of real estate. The considerations bearing upon other foreclosures and forced sales (to satisfy tax liens, for example) may be different." Id. at 1761 n.3. For the reasons discussed above, however, we find that BFP's reasoning guides our reading of § 549(c)'s requirement of "present fair equivalent value." The Court's disclaimer on the breadth of its decision in BFP did not preclude extension of its

---

[3]Also, to the extent that Stone is correct that "present" value excludes any amounts used to satisfy antecedent debt, that reading may offer another way in which § 549 is stricter than § 548, since, as Stone recognizes, satisfaction of antecedent debt can be used to meet § 548 requirement of "reasonably equivalent value."

reasoning to a case, such as this one, where traditional rules of statutory construction and deference to state regulatory interests support the same outcome.

In sum, we read BFP to say that, in the context of a forced sale, (1) § 549(c)'s requirement of "present fair equivalent value" ought not be measured against the property's "fair market value"; and (2) given the State's essential interest in maintaining clear titles to real property, we should not attempt to ascertain the substantive content of "present fair equivalent value."[4]  We hold, in accordance with the logic of BFP, that the tax-sale transfer of Stone Companies' land to the Kidds — which Stone Companies concedes was noncollusive and conducted in conformity with Oklahoma law — satisfied § 549(c)'s requirement that the sale be "for present fair equivalent value."

AFFIRMED.

---

[4]We decline to follow In re Shaw, 157 B.R. 151 (Bankr. 9th Cir. 1993), in which the bankruptcy court held that the different language in § 549(c) compelled closer adherence to fair market value than the language of § 548.  Id. at 153-54.  In re Shaw was decided before BFP, and the reasoning of BFP, which disapproves of a fair market value benchmark in a forced-sale context, casts doubt on the bankruptcy court's analysis in In re Shaw.