**In re Jerry Wayne TURNER, dba Jerry's Video, Debtor.**

**Jerry Wayne TURNER, dba Jerry's Video, Plaintiff,**

**v.**

**UNITED STATES of America, Douglas Rybolt, and Christine Rybolt, Defendants.**

Bankruptcy No. 96–72938.
Adversary No. 96–8319.

United States Bankruptcy Court,
D. South Carolina.

Oct. 3, 1997.

James M. Williams, III, Clemson, SC, for Plaintiff.

James H. Cassidy, Love, Thornton, Arnold & Thomason, P.A., Greenville, SC, for Douglas & Christine Rybolt.

Steven Webster, U.S. Department of Justice, Washington, DC, for I.R.S.

## ORDER

WM. THURMOND BISHOP, Bankruptcy Judge.

This Adversary Proceeding was heard by the Court on August 12, 1997, pursuant to notice. Per the Order of the Court dated May 30, 1997, the parties were required to file a Joint Pretrial Order which has been presented to the Court.

The Court also considered the Motion of the United States for summary judgment on specific issues. It appears from the stipulation of fact and the argument of counsel, the issues before the Court are as follows:

1. Was the sale of the Internal Revenue Service a fraudulent conveyance?

2. Should the tax sale be set aside as a preference?

3. Should the tax sale be confirmed in favor of the purchasers, Rybolt?

Prior to trial, the parties stipulated to the following facts:

### STIPULATED FACTS

1. The debtor, Jerry Turner d/b/a Jerry's Video, operated video stores in Pickens County, South Carolina, during the years 1991 through 1996.

2. Prior to and during 1995, Jerry Turner owned two parcels of real property (the "property") on South Carolina Highway # 93 in Pickens County, South Carolina, from which he operated a Jerry's Video location.

3. During 1991 to 1994, Jerry Turner failed to fully pay $57,006.14 in assessed federal payroll tax liabilities, including interest and penalties.

4. On September 19, 1995, the United States, through the Internal Revenue Service, administratively seized the property for the purpose of satisfying the delinquent tax liabilities through a tax sale.

5. On October 31, 1995, the Internal Revenue Service set the minimum bid price for the sale of the property equal to the debt owed, at $57,006.14. The Minimum Bid Worksheet, Form 4585, was provided to Turner on that date.

6. The back page of the Minimum Bid Worksheet (Form 4585) that was also provided by the Internal Revenue Service to Turner on or about October 31, 1995.

7. Turner did not administratively challenge the minimum bid price.

8. The Internal Revenue Service delayed selling the property for several months to permit the debtor the opportunity to procure financing to pay the balance due related to the seizure, which was also the minimum bid price, prior to sale.

9. The Internal Revenue Service actively solicited potential buyers in Clemson, South Carolina and in Central, South Carolina by contacting realtors, developers, and businesses.

10. On March 5, 1996, the Internal Revenue Service conducted a public auction but did not obtain an offer higher than or equal to the minimum bid price. As a result, the sale was adjourned until March 19, 1996.

11. Six months after the seizure of the property, on March 19, 1996, the Internal Revenue Service conducted a second public auction to sell the property. At the auction, Defendants Douglas and Christine Rybolt (Rybolts) bid and paid the minimum bid price for the property to the Internal Revenue Service.

12. Also on March 19, 1996, the Internal Revenue Service provided the Rybolts with a Certificate of Sale of Seized Property.

13. Forty days later, on April 29, 1996, Jerry Turner filed a Chapter 11 petition in bankruptcy.

14. The statutory redemption period, which is the 180–day period under Section 6337 of the Internal Revenue Code within which a taxpayer can redeem property that has been sold, expired on September 15, 1996.

15. Following the statutory redemption period, on October 1, 1996, the Internal Revenue Service and pursuant to Internal Revenue Code Section 6338, deeded the property to the Rybolts.

16. On December 17, 1996, debtor Jerry Turner filed the instant adversary proceeding.

17. On or about January 9, 1997, the Rybolts answered the complaint, counterclaimed against the debtor, and crossclaimed against the United States.

18. On February 21, 1997, following a consent order to enlarge the time to respond to the complaint, the United States timely answered the complaint and crossclaim.

19. The debtor had failed to pay additional federal tax liabilities, which are reflected on the proof of claim filed by the United States in this case. (Joint Ex. 6)

20. At the March 5 sale, there were three potential bidders (or groups of bidders). Turner was also at this sale. The minimum bid price was announced and because there were no bids equal to or more than the minimum bid price, the sale was adjourned.

21. The other debts that were senior to the federal tax liens, and would therefore be included to derive the total price paid by the Rybolts, were as follows:

| | |
|---|---|
| Mortgage to BB & T | $2,731 |
| Mortgage to M. Skolve | 18,887 |
| County and State Taxes | 414 |
| | 22,032 |
| IRS Minimum Price | 57,006 |
| Total Purchase Price | $ 79,038 |

22. The 1996 real estate property tax assessment value for the property was $76,579.

23. The actual cost to the United States for the levy and sale of the property was $257.

24. The parties do not stipulate as to the fair market value of the property at any time and specifically, that although the minimum bid worksheet prepared by the Internal Revenue Service is admissible to show that a minimum bid price was determined, there is

no agreement that the line 5 "Property value" amount of $200,000 was the fair market value, but merely Turner's personal opinion of the value of the properties. After the seizure, Turner informed the Internal Revenue Service of his opinion that the property was worth $200,000. Turner also had a formal appraisal prepared in February 1996, which also arrived at the same $200,000 value. The Internal Revenue Service was aware of the appraisal prior to the opening of both sales.

25. The FICA and FUTA tax assessments dated 3/27/95 and 4/3/95 had not been submitted to the field for collection by a Revenue Officer at the time of the levy and seizure of the property in October 1995. The IRS Revenue Officer conducting the sales was aware of the existence of the additional assessments when the sales were conducted. (Joint Ex. 6)

26. Turner was at both of the sales conducted by the Internal Revenue Service.

Based upon the stipulated facts and the arguments of counsel, the Court makes the following findings of fact and conclusions of law:

## I. THE TAX SALE IS NOT A FRAUDULENT CONVEYANCE

Generally, a debtor cannot set aside a pre-petition foreclosure sale of the debtor's property as a fraudulent conveyance under 11 U.S.C. § 548.[1] In *BFP v. Resolution Trust Corporation*, 511 U.S. 531, 114 S.Ct. 1757, 128 L.Ed.2d 556 (1994), the Supreme Court held that a "reasonably equivalent value" for foreclosed real property is the price received at the foreclosure sale if all of the requirements of the state's foreclosure law have been complied with. In the *BFP* case, the Supreme Court stated that (*Id.* at 531–32, 114 S.Ct. 1757):

fair market value presumes market conditions that, by definition, do not obtain in the forced-sale context, since property sold within the time and manner strictures of state-prescribed foreclosure is simply worth less than property sold without such restrictions. "Reasonably equivalent value" also cannot be read to mean a "reasonable" or "fair" forced-sale price, such as a percentage of fair market value. To specify a federal minimum sale price beyond what state foreclosure law requires would extend bankruptcy law well beyond the traditional field of fraudulent transfers and upset the coexistence that fraudulent transfer law and foreclosure law have enjoyed for over 400 years.

Numerous fraudulent conveyance challenges have been pursued to set aside tax sales, but the *BFP* precedent has been consistently applied to leave tax sales of property undisturbed. *In re Hollar*, 184 B.R. 243, 251 (Bankr.M.D.N.C.1995); *In re Lord*, 179 B.R. 429 (Bankr.E.D.Pa.1995) (price paid equal to one-tenth of property's fair market value despite absence of post-sale redemption right); *Skipwith v. Gover*, 868 F.Supp. 400 (D.Mass.1994) (IRS sale of property at minimum bid price); *In re Comis*, 181 B.R. 145 (Bankr.N.D.N.Y.1994) (sales price of $6,250 despite $20,000 fair market value); *In re Golden*, 190 B.R. 52 (Bankr.W.D.Pa.1995); *In re McGrath*, 170 B.R. 78 (Bankr.D.N.J. 1994); *In re Russell–Polk*, 200 B.R. 218 (Bankr.E.D.Mo.1996). In *Hollar*, the court compared tax sales to mortgage foreclosures sales (emphasis added):

In each instance, the applicable statute requires posting of a public notice of sale. Both types of sale are conducted by public auction with competitive bidding. The property owner is then granted a period of time to exercise the equity of redemption. In fact, the **protections afforded property owners at IRS tax sales**, such as a minimum acceptable bid and a long (six months) redemption period, **are arguably**

---

1. Section 548 of the Bankruptcy Code, 11 U.S.C. § 548, sets forth the powers of a trustee in bankruptcy (or, in a Chapter 11 case, a debtor in possession) to avoid fraudulent transfers. It permits avoidance if the trustee can establish (1) that the debtor had an interest in property; (2) that a transfer of that interest occurred within one year of the filing of the bankruptcy petition; (3) that the debtor was insolvent at the time of the transfer or became insolvent as a result thereof; and (4) that the debtor received "less than a reasonably equivalent value in exchange for such transfer." 11 U.S.C. § 548(a)(2)(A).

**greater** than those provided in most foreclosure statutes.[2]

The Fifth Circuit, which appears to be the only circuit to have considered *BFP* in a tax sale, held that a county tax sale of real property for only $325 (with a purported value of $65,000) could not be set aside as a fraudulent conveyance. *In re T.F. Stone Co., Inc. v. Harper*, 72 F.3d 466 (5th Cir.1995). In that case, the court specifically adopted the reasoning espoused by the Supreme Court, in that (emphasis added)—

> any effort to ascertain what constitutes a reasonable or fair forced sales price **requires a policy judgment that courts ought not to attempt**, *id.* at 471, *citing BFP*, 511 U.S. 531, 114 S.Ct. at 1762, and further added that "any **judicial effort to determine the purported content of such a thing as a 'reasonable' or 'fair' forced-sales price**," *id.*, would require policy judgments that are **inappropriate for courts** and are fraught with the same difficulties in the context of both mortgage foreclosure sales and sales conducted to satisfy tax obligations. *Id.*

See also *In re O'Neill*, 204 B.R. 881 (Bankr. E.D.Pa.1997) (foreclosure sale).

The only defect alleged by the Plaintiff in the tax sale procedure was that the minimum bid prepared by the IRS was deceptive and not prepared in accordance with the IRS manual. Accordingly, the tax sale should be set aside as irregular. I find that the attack upon the Minimum Bid Worksheet is devoid of facts to support it and the argument is without merit. I further find that the IRS complied with all statutory requirements to complete a tax sale and the Plaintiff was provided with all the necessary notices required under the statute and all procedures were followed correctly. I further find that Section 26 U.S.C. § 6335(e)[3] provides that "the Secretary shall determine a minimum price for which property shall be sold (taking into account the expense of making a levy and conducting the sale)." I find that the IRS complied with the requirement to set a minimum bid as required by Section 6335(e).

Accordingly, this Court adopts the holding in *BFP* and applies its principals to a tax sale.

## II. TAX SALE IS NOT A PREFERENCE

 Plaintiff abandoned his agreement that the tax sale constituted a preference. In any event, this sale was not a preference as the Federal Tax lien constituted a secured priority lien which was entitled to be paid from the proceeds of sale generated by the tax sale. Accordingly, I find that the prepetition transfers of property to secured creditors are not preferences. *Holland v. Commissioner*, 102 B.R. 208 (Bankr.S.D.Cal. 1989); *Union Meeting Partners v. Lincoln*

---

2. The court continued: [t]his conclusion is supported by recent decisions applying the reasoning of BFP to state tax foreclosure sales. See *In re McGrath*, 170 B.R. 78 (Bankr.D.N.J.1994) (applies *BFP* rule to find that purchase price in New Jersey tax foreclosure sale was "reasonably equivalent value" for the debtor's interest in the property under 11 U.S.C. § 548(a)(2)(A)); *In re T.F. Stone Companies, Inc.*, 170 B.R. 884 (Bankr. N.D.Tex.1994) (BFP rationale is likewise compelling in concluding that price obtained at properly-conducted, noncollusive tax foreclosure sale presumptively meets the "present fair equivalent value" standard in § 549(c)); but see *In re Butler*, 171 B.R. 321 (Bankr.N.D.Ill.1994) (notwithstanding *BFP*, adherence to state law procedures with respect to a tax sale does not preclude an investigation as to whether the debtor received less than "reasonably equivalent value" for her property).

3. Section 6335, in pertinent part, provides:

(e) Manner and conditions of sale.—
 (1) In general.—
 (A) Determinations relating to minimum price.—Before the sale of property seized by levy, the Secretary shall determine—
 (i) a minimum price for which such property shall be sold (taking into account the expense of making the levy and conducting the sale),
 (2) Additional rules applicable to sale.—The Secretary shall by regulations prescribe the manner and other conditions of the sale of property seized by levy. If one or more alternative methods or conditions are permitted by regulations, the Secretary shall select the alternatives applicable to the sale. Such regulations shall provide:

 \* \* \*

 (C) Whether the announcement of the minimum price determined by the Secretary may be delayed until the receipt of the highest bid.

# 600

National Life Ins., 163 B.R. 229 (Bankr. E.D.Pa.1994); *Zimmerman v. Commonwealth of Pennsylvania*, 80 B.R. 337 (Bankr. E.D.Pa.1987). Therefore, the tax sale did not constitute a preference and cannot be disrupted.

### III. THE TAX SALE SHOULD BE CONFIRMED AND THE TITLE GRANTED TO THE RYBOLTS REAFFIRMED

The Rybolts are indisputedly innocent purchasers for value. They attended a properly noticed tax sale to which the Plaintiff was afforded all of his statutory rights. At no point has the Plaintiff argued that he was not afforded due process.

■ This Court finds that the Internal Revenue Service followed every procedural requirement in conducting the tax sale and none of the Plaintiff's rights were violated. Accordingly, the title to the subject property should be confirmed and the deed granting the Rybolts the subject property dated October 1, 1996 should be reaffirmed.

### CONCLUSION

The action of the Plaintiff should be dismissed and the counterclaim of the Rybolts seeking confirmation of the title in their names should be granted.

Based upon the findings of fact and conclusions of law,

IT IS ORDERED, ADJUDGED AND DECREED that the United States of America is substituted as a party Defendant and the Internal Revenue Service is removed.

IT IS FURTHER ORDERED, ADJUDGED AND DECREED that the action of the Plaintiff be, and hereby is, dismissed with prejudice.

IT IS FURTHER ORDERED, ADJUDGED AND DECREED that the counterclaim of the Defendants, Rybolt, be, and hereby is, granted and the deed dated October 1, 1996 from the United States of America to the Rybolts is confirmed.

IT IS SO ORDERED.