In the

# United States Court of Appeals

## For the Seventh Circuit

---

No. 14-2174

IN RE:

EQUIPMENT ACQUISITION RESOURCES, INC.

*Debtor.*

WILLIAM A. BRANDT, JR.,

*Plaintiff-Appellant,*

*v.*

HORSESHOE HAMMOND, LLC,

*Defendant-Appellee.*

---

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 1:12-cv-00271 — **Edmond E. Chang**, *Judge.*

---

ARGUED SEPTEMBER 22, 2015 — DECIDED OCTOBER 13, 2015

---

Before FLAUM, WILLIAMS, and HAMILTON, *Circuit Judges.*

FLAUM, *Circuit Judge.* In this adversary proceeding, William Brandt, acting as plan administrator for Equipment Acquisition Resources ("EAR"), seeks to avoid and recover fraudulent transfers made to the Horseshoe Casino ("Horse-

shoe"). Brandt alleges that EAR made fraudulent transfers to Sheldon Player, the original owner of EAR, and that Player used these funds at Horseshoe. Horseshoe moved for summary judgment under the statutory defense of good faith, 11 U.S.C. § 550(b)(1). The district court granted the motion. On appeal, Brandt argues that the district court erred in interpreting and applying § 550(b)(1). Brandt also argues that the district court improperly denied his motion to compel production of documents related to any investigations Horseshoe may have made concerning Player. Because we conclude that the district court correctly interpreted and applied § 550(b)(1) and that Brandt did not suffer prejudice from the denial of his motion to compel, we affirm.

## I. Background

In 1997, Player and his wife, Donna Malone, established EAR. Under its purported business model, EAR manufactured and refurbished machinery used in the high-technology industry. However, from at least 2005 to 2009, EAR engaged in a scheme to defraud its creditors involving its financing of equipment. As a result of this scheme, Player and Malone received approximately $17 million in fraudulent transfers from EAR.

Initially, EAR's creditors and advisors did not detect the scheme. In July 2009, EAR hired FTI Consulting, a forensic accounting firm, to review its books and records. FTI did not uncover the fraud until September 29, 2009. Once EAR's fraud was exposed, the members of EAR's board and its officers resigned. EAR's shareholders elected William Brandt as the sole board member and Chief Restructuring Officer. On October 23, 2009, EAR filed for Chapter 11 bankruptcy.

Before the fraud was detected, Player and Malone used the fraudulent transfers for their personal benefit. In particular, Player and Malone spent large amounts at the Horseshoe Casino in Hammond, Indiana. From February 2007 to August 2009, Player and Malone made over $8 million in payments to Horseshoe. Player was a frequent presence at Horseshoe, at times spending over fifty hours per week at the casino.

Player's gambling activity at Horseshoe was often erratic. In addition to spending large sums at the casino, Player was known to "walk with chips." Walking with chips is the practice of leaving a casino with chips rather than cashing them in. Similarly, Player was known by the casino to "pass chips." Passing chips is the practice of giving chips to a third party to cash in. Neither walking with chips nor passing chips is illegal, however, both practices are potentially indicative of "structuring" transactions to avoid triggering the $10,000 reporting requirement, a federal crime. *See* 31 U.S.C. § 5324. In total, Brandt alleges that Player passed or walked with over $6 million in chips at Horseshoe.

Player also made false statements on his Horseshoe credit application. Both Player and Malone filled out Horseshoe credit applications. Horseshoe ran credit checks on Player and Malone showing that they had understated their indebtedness by over $2 million. Although Horseshoe knew that Player's application misrepresented his debt, it still extended credit to Player. Gradually, Horseshoe increased Player's credit line from $25,000 to $450,000. As Player's credit line increased, it exceeded the balance of Player's on-file checking account. Player also overstated his salary by more than three times his actual salary and claimed to be the owner of

EAR even though he was not actually a shareholder of EAR at the time. Horseshoe did not try to verify these statements.

In addition to Player's claimed ownership of EAR in his credit application, Horseshoe had other reasons to believe that Player's money came from EAR. Because Player's credit exceeded his personal checking account balance, Horseshoe kept an EAR account on file as a "reference account." More-over, Player and Malone paid some of their gambling debts from a bank account in the name of "Donna Malone doing business as EAR." Horseshoe identified this account as a business account, yet nonetheless accepted and deposited checks from it. Finally, one of Player's on-file checking ac-counts listed EAR's corporate address.

After the extent of EAR's fraud was revealed, Brandt, act-ing as the bankruptcy court-appointed plan administrator of EAR, filed this adversary proceeding to avoid and recover the transfers made to Horseshoe. Brandt seeks to avoid and recover $8,248,000 in transfers to Horseshoe under §§ 544, 548, and 550 of the Bankruptcy Code.

During pre-trial discovery, Brandt filed a motion to com-pel production of documents related to any investigation Horseshoe may have performed regarding Player's gam-bling activities. Horseshoe objected to the motion to compel under treasury regulation 31 C.F.R. § 1021.320(e). Section 1021.320 governs Suspicious Activity Reports (SARs), which are filed by financial institutions, including casinos, to detect money laundering and other violations of the Bank Secrecy Act. Subsection (e) requires the confidentiality of a "SAR, and any information that would reveal the existence of a SAR ...." § 1021.320(e); *see also* 12 C.F.R. § 21.11(k) (imposing the same requirement on banks).

At a status hearing on the motion to compel, Horseshoe claimed that all investigatory documents (if any) were protected by the regulation. The district court judge asked Brandt's counsel to leave the courtroom, which he did without objection. The district court then engaged in an *ex parte* discussion under seal with Horseshoe's counsel. Afterwards, the district court ordered an *ex parte* filing by Horseshoe, which was also inaccessible to Brandt. After this filing, the district court ordered another *ex parte* filing by Horseshoe. Although Brandt was permitted to dispute the appropriate legal standard for confidentiality under § 1021.320(e), he was not allowed to inspect the *ex parte* factual declarations. At no point did Brandt object to any of these procedures.

On October 16, 2012, the district court denied Brandt's motion to compel. The court informed Brandt that it had made a factual determination based on Horseshoe's initial and supplemental *ex parte* filings. After Brandt's counsel asked for a further explanation, the district court responded that Brandt "basically won on the legal standard" but that "even applying that standard … the motion is appropriately denied."

On August 23, 2013, Horseshoe filed a motion for summary judgment seeking dismissal of all three counts of Brandt's complaint under the § 550(b)(1) good faith defense, arguing it had acted without knowledge of the fraud at EAR.

On May 15, 2014, the district court granted Horseshoe's motion for summary judgment on all counts. The district court found that Horseshoe accepted the transfers without knowledge of the fraud at EAR and that Horseshoe could not have uncovered the fraud even if it had investigated. As a result, the court concluded that a reasonable jury must find

that Horseshoe took transfers from Player in good faith and without knowledge of the fraud.

In this appeal, Brandt argues that the district court erred by (1) granting summary judgment to Horseshoe under the good faith defense, § 550(b)(1); and (2) denying Brandt's motion to compel based on *ex parte* communications with Horseshoe's counsel.

## II. Discussion

Brandt seeks to avoid and recover transfers made to Horseshoe. In order to succeed, Brandt must prove that the transfers are voidable under § 544 or § 548 and recoverable under § 550 of the Bankruptcy Code. In general, transfers are voidable if they were made with intent to hinder, delay, or defraud creditors or if the debtor was under financial distress at the time of the transfer. *See* § 548(a)(1).

Transfers that are voidable are generally recoverable under § 550. Section 550 permits a trustee to recover any transfer avoided to an "initial transferee" or to "any immediate or mediate transferee of such initial transferee." § 550(a). However, § 550(b)(1) provides a defense to recovery:

> (b) The trustee may not recover under section (a)(2) of this section from—
> (1) a transferee that takes for value, including satisfaction or securing of a present or antecedent debt, *in good faith, and without knowledge of the voidability of the transfer avoided*;

§ 550(b)(1) (emphasis added). Therefore, this "good faith" defense applies if the transferee: (1) is an immediate or mediate transferee under § 550(a)(2); (2) took the transfers for

value; (3) took the transfers "in good faith;" and (4) took the transfers "without knowledge of the voidability of the transfer avoided." *Id.*

The parties do not dispute that Horseshoe satisfies the first and second elements of this defense. At issue is whether Horseshoe took the transfers "in good faith" and "without knowledge of the voidability of the transfer avoided."

This Court reviews a district court's grant of summary judgment de novo. *Conley v. Birch*, 796 F.3d 742, 746 (7th Cir. 2015). In deciding a motion for summary judgment, this Court must examine the record in the light most favorable to the nonmoving party, in this case, Brandt. *Id.* Summary judgment is appropriate if there is no genuine dispute of material fact and the nonmoving party is entitled to judgment as a matter of law. *Id.*

### A. Without Knowledge

Turning first to whether Horseshoe took the transfers "without knowledge," this Court previously examined this requirement in *Bonded Financial Services, Inc. v. European American Bank*, 838 F.2d 890 (7th Cir. 1988). In *Bonded*, the debtor, Bonded Financial Services, sent the European American Bank a transfer of $200,000 with instructions to deposit it in the account of one of Bonded's executives, Mike Ryan. After it did this, Ryan instructed the bank to use the amount to reduce an outstanding loan he had with the bank. Once again, the bank did as instructed. A month later, Bonded filed for bankruptcy. Bonded's trustee sought to recover the $200,000 transferred from Bonded to the bank via Ryan as a fraudulent transfer. The bank asserted § 550(b)(1) as a defense.

The *Bonded* Court found that § 550(b)(1) codified an imputed knowledge or inquiry notice standard. 838 F.2d at 898. Accordingly, knowledge in § 550(b)(1) means less than "complete understanding of the facts and receipt of a lawyer's opinion that such a transfer is voidable …." *Id.* Nevertheless, inquiry notice must be sufficient to enable the party to have gained actual knowledge by inquiring. If a reasonable inquiry would not have led to actual knowledge of voidability, a court cannot impute knowledge. *Id.* ("Since the inquiry would have turned up nothing pertinent to voidability, the Bank's failure to make it does not permit a court to attribute to it the necessary knowledge.").

Applying this interpretation to the facts in *Bonded*, this Court held that § 550(b)(1) applied to the transfer from Ryan to the Bank because the Bank acted without knowledge. *Id.* The Court noted that "[n]othing in the record of this case suggests that the Bank knew of Bonded's financial peril or Ryan's plan." *Id.* Moreover, we declined to impute any knowledge to the bank because even if it had made a reasonable inquiry into the transfer, the bank would have only learned "that the instrument was authorized by the appropriate corporate officials." *Id.* Consequently, the inquiry would not have revealed that the transaction was voidable.

In the case at hand, the parties disagree over how exactly to apply *Bonded* to a two-step transaction. Here, the money flowed from EAR to Player and Malone as a result of fraud and then to Horseshoe. Section 550(b)(1) provides that the transferee must act "without knowledge of the voidability *of the transfer avoided*." § 550(b)(1) (emphasis added). Brandt contends that "the transfer avoided" refers to the entire chain—from EAR, to Player and Malone, to Horseshoe. We

disagree. The statute and our case law reveal that "the transfer avoided" refers only to the first transfer from the debtor to initial transferee, in this case, from EAR to Player and Malone.

First, the language of § 550(b)(1) supports this interpretation. The phrase "the transfer avoided" in § 550(b)(1) refers back to the transfer described in § 550(a). Section 550(a), in turn, explicitly refers to this transfer as the transfer avoided under § 544 or § 548. Section 548 makes clear that this transfer is only the transfer from the debtor to the initial transferee. *See* § 548 ("The trustee may avoid any transfer … if the *debtor* voluntarily or involuntarily made such transfer …." (emphasis added)). In other words, the statutory context limits "the transfer avoided" to the transfer between the debtor and the initial transferee. Indeed, it is only the transfer from the debtor to the initial transferee that is avoided under § 548. Subsequent transfers are not avoided under § 548, they are recovered under § 550.

Second, our reasoning in *Bonded* supports this reading. *Bonded*'s analysis focused on what the bank knew about the transfer from the debtor, Bonded, to the initial transferee, Ryan. In particular, we concluded that the bank did not know that the transfer was voidable because it had no knowledge of "Bonded's financial peril or Ryan's plan." *Bonded*, 838 F.3d at 898. The circumstances did "not hint at a fraudulent conveyance by a firm on the brink of insolvency" and "the Bank had no reason to think Ryan an embezzler." *Id.* As in *Bonded*, our analysis here must focus on what Horseshoe knew about the first link in the chain, from EAR to Player and Malone.

The economic justification underpinning fraudulent conveyance law also supports this interpretation. In *Bonded*, we explained that fraudulent conveyance law saves creditors monitoring costs by protecting them against last-minute diminutions in their debtors' assets. *Id.* at 892. Yet, we acknowledged that there are limits on the pursuit of transfers and there remains an important role for creditors to monitor debtors:

> If the recipient of a fraudulent conveyance uses the money to buy a Rolls Royce, the auto dealer need not return the money to the bankrupt even if the trustee can identify the serial numbers on the bills. The misfortune of the firm's creditors is not a good reason to mulct the dealer, who gave value for the money and was in no position to monitor the debtor. Some monitoring is both inevitable and desirable, and the creditors are in a better position to carry out this task than are auto dealers and the many others with whom the firm's transferees may deal.

*Id.*

Since § 550 should efficiently allocate monitoring costs between creditors and transferees, it makes sense to provide a defense to liability for subsequent transferees who act without knowledge of the fraudulent transfer from the debtor. Horseshoe, like the Rolls Royce dealer, is a subsequent transferee. Compared with the creditors, Horseshoe is a lesser monitor of the debtor, EAR. Therefore, unless Horseshoe had some reason to know that it was receiving funds result-

ing from a fraudulent transfer, it should not be liable to EAR's creditors.

Applying this standard, the undisputed facts show that Horseshoe acted "without knowledge of the voidability of the transfer avoided." Both parties agree that Horseshoe lacked actual knowledge that the transfers from EAR to Player and Malone were voidable. That is, Horseshoe had no actual knowledge that the transfers arose from fraud at EAR or that EAR was under financial distress.

Brandt, however, argues that Horseshoe was on inquiry notice that these transfers were voidable. Brandt points to various "red flags," which he claims should have alerted Horseshoe that it was receiving fraudulent transfers. Specifically, Horseshoe knew about Player's erratic gambling habits, including walking with and passing chips, that Player made false statements on his credit application, and that Player received his money from EAR.

We are not convinced that these red flags are sufficient to impose a duty on Horseshoe to investigate transfers from EAR to Player. Most of these red flags only relate to Player and lack a clear connection to EAR. Even Brandt's own experts testified that nothing about Player's gambling activities would have alerted Horseshoe to EAR's fraud.

Although Horseshoe had some indication that Player's money came from EAR, it had no reason to suspect that this money was obtained by fraud. Player claimed to be the owner of EAR and so the fact that Player's money came from EAR would not have been of special significance to Horseshoe. As we said in *Bonded*, a transfer of money from a company to one of its executives "does not hint at a fraudulent

conveyance by a firm on the brink of insolvency ….” 838
F.3d at 898.

Regardless, even if Horseshoe had investigated, it is un-
likely—in fact, virtually impossible—that Horseshoe would
have uncovered the fraud or EAR’s financial distress. As this
Court stated in *Bonded*, when a subsequent transferee’s rea-
sonable inquiry “would have turned up nothing pertinent to
voidability, the [transferee’s] failure to make it does not per-
mit a court to attribute to it the necessary knowledge.” *Id.*
Even assuming that Horseshoe was put on inquiry notice of
a fraudulent transfer, a reasonable inquiry would have
turned up nothing indicating that the transfers were voida-
ble. At the time of these transfers, EAR’s creditors and advi-
sors, who had complete access to EAR’s books and records,
were unaware of the ongoing fraud and financial distress. It
took FTI Consulting, a forensic accounting firm, nearly three
months to discover the fraud. Horseshoe knew that Player’s
funds might have come from EAR, but § 550(b)(1) and *Bond-
ed* make clear that knowledge of the transfers’ origin is insuf-
ficient. Therefore, the district court correctly determined that
a reasonable jury would find that Horseshoe acted “without
knowledge of the voidability of the transfer avoided.”

## B. Good Faith

Brandt also argues that the district court erred by not
separately considering whether Horseshoe acted “in good
faith.” In *Bonded*, this Court expressly reserved the question
of whether good faith operated as a discrete requirement
from “without knowledge.” 838 F.3d at 897. But the Court
noted that “the recipient of a voidable transfer may lack
good faith if he possessed enough knowledge of the events
to induce a reasonable person to investigate.” *Id.* at 897–98.

The district court declined to analyze good faith separately from "without knowledge." The court reasoned that even if the two elements were considered separately, good faith is satisfied because Horseshoe could not have known about EAR's fraud or financial distress.

On appeal, Brandt argues that the district court erred by not separately considering good faith. In doing so, Brandt asks this Court to adopt a standard of good faith distinct from without knowledge. In particular, Brandt contends that Horseshoe did not act in good faith by extending credit to Player despite misrepresentations on his credit application, continuing to do business with Player even though his activities suggested he was laundering money through the casino, and accepting funds from a checking account that Horseshoe believed to be an EAR business account. To support his reading, Brandt points to the legislative history of § 550(b)(1), which states that:

> The phrase "good faith" in [§ 550(b)] is intended to prevent a transferee from whom the trustee could recover from transferring the recoverable property to an innocent transferee, and receiving a transfer from him, that is, "washing" the transaction through an innocent third party. In order for the transferee to be excepted from liability … he himself must be a good faith transferee.

H.R. Rep. No. 95-595, at 376 (1977); S. Rep. No. 95-989, at 90 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5787, 5876. Brandt seizes on the reference to "washing" a transaction to argue that Player used Horseshoe to "wash" his fraudulently obtained assets, and thus Horseshoe did not act in good faith.

However, this interpretation takes the reference to "washing" out of context. The legislative history states that "good faith" prevents a transferee from escaping liability by "washing" the transaction through an innocent third party. Here, Horseshoe is the innocent third party, not the money-washing transferee. In contrast, Player, who allegedly laundered his money through Horseshoe, would seem to lack good faith under this interpretation.

Still, without pointing to any other authority, Brandt invites this Court to embrace a different definition of good faith, one that excludes Horseshoe's conduct. We decline this invitation. Horseshoe had no way of knowing the transactions from EAR to Player were voidable, and thus, was not closing its eyes to the creditors' plight. There is no indication that any alleged lack of diligence was the product of bad faith. In sum, a reasonable jury would conclude that Horseshoe acted "in good faith and without knowledge of the voidability of the transfer avoided." Hence, the district court properly granted summary judgment in favor of Horseshoe.

### C. The Motion to Compel

Brandt also asks this Court to reverse summary judgment because the district court denied his motion to compel. During pre-trial discovery, Brandt moved to compel production of documents from Horseshoe relating to any investigation into Player's gambling activities. Horseshoe opposed the motion under § 1021.320(e), which requires the confidentiality of SARs and information revealing the existence of a SAR. Horseshoe claimed that all investigatory documents, if any, were protected under the regulation. The district court ultimately agreed with Horseshoe and denied Brandt's motion to compel. In deciding the motion, the district court relied on

a number of *ex parte* under seal communications with Horse-shoe's counsel.

First, Brandt argues that the district court's decision improperly relied on *ex parte* communications with Horseshoe's counsel, depriving him of a full and fair hearing in violation of his due process rights. This argument is waived. Brandt never raised an objection to the district court's use of *ex parte* communications. *See A. Bauer Mech., Inc. v. Joint Arbitration Bd. of the Plumbing Contractors' Ass'n*, 562 F.3d 784, 792 (7th Cir. 2009) (holding that due process arguments are waived if not raised before the district court). Brandt claims that he never had an opportunity to object, but the record reflects a different story. At every step of the way, Brandt was informed of the *ex parte* procedures and had an opportunity to object to them. In fact, after the district court made its ruling on the motion to compel, Brandt even stated that he was "not really asking for reconsideration …." Therefore, this argument is waived, and we need not address it.

Second, Brandt argues that the district court should have granted the motion to compel and required Horseshoe to turn over all documents related to any investigation of Player. Brandt is forced to make this argument in the dark, as the *ex parte* communications are still under seal and inaccessible to him. According to Brandt, under the correct legal standard, the motion to compel should have been granted. However, the motion only pertains to Horseshoe's investigations into Player. Even assuming the confidentiality requirement does not apply, these documents, if any, have nothing to do with EAR's fraud or financial distress. At most, they would have shown that Player was laundering money through the casino, but not that Player obtained the money by perpetrat-

ing a fraud against EAR's creditors. In other words, the motion to compel could not have revealed that Horseshoe had knowledge of the voidability of the transfers or acted without good faith. As a result, assuming arguendo that the district court did err by denying the motion to compel, Brandt did not suffer any prejudice. *e360 Insight, Inc. v. Spamhaus Project*, 658 F.3d 637, 644 (7th Cir. 2011) ("[W]e will not grant any relief 'absent a clear showing that the denial of discovery resulted in actual and substantial prejudice.'" (quoting *Searls v. Glasser*, 64 F.3d 1061, 1068 (7th Cir. 1995))). Because Brandt cannot demonstrate that he suffered any prejudice, we affirm the denial of the motion to compel.

### III. Conclusion

For the foregoing reasons, we AFFIRM the judgment of the district court.