In the

# United States Court of Appeals
## For the Seventh Circuit

No. 15-1166

IN RE: KEITH SMITH and DAWN SMITH,

*Debtors.*

KEITH SMITH and DAWN SMITH,

*Plaintiffs-Appellants*,

*v.*

SIPI, LLC, and MIDWEST CAPITAL INVESTMENTS, LLC,

*Defendants-Appellees.*

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 1:13-cv-06422 — **Harry D. Leinenweber**, *Judge.*

ARGUED SEPTEMBER 11, 2015 — DECIDED JANUARY 20, 2016

Before BAUER, WILLIAMS, and HAMILTON, *Circuit Judges*.

HAMILTON, *Circuit Judge*. Federal bankruptcy law provides generally that a sale or other transfer of an insolvent debtor's property may be set aside as fraudulent if the transfer was for less than "reasonably equivalent value." 11 U.S.C. § 548(a)(1)(B). In this appeal, we apply this general rule to a lawfully conducted sale of real estate under Illinois property

tax sale procedures. The principal question is whether compliance with state law for tax sales is sufficient to establish that the sale was for "reasonably equivalent value," or whether the debtor may try to set aside the sale under § 548(a)(1)(B).

In *BFP v. Resolution Trust Corp.*, 511 U.S. 531 (1994), the Supreme Court held that a mortgage foreclosure sale that complies with state law is deemed for "reasonably equivalent value" as a matter of law. This rule applies even though the forced nature of the foreclosure sale will often result in a sale price well below a fair market price between a willing buyer and willing seller. Based on fundamental differences between the bidding methods used, however, we conclude that the reasoning of *BFP* does not extend to Illinois tax sales of real property.

Unlike mortgage foreclosure sales and some other states' tax sales, Illinois tax sales do not involve competitive bidding where the highest bid wins. Instead, bidders bid how *little* money they are willing to accept in return for payment of the owner's delinquent taxes. The *lowest* bid wins, and the bid amounts bear no relationship to the value of the underlying real estate. We therefore agree with the bankruptcy court, disagree with the district court, and apply the general rule of § 548(a)(1)(B). We affirm the judgment of the bankruptcy court.

I.  *Factual and Procedural Background*

From about 1998 to 2009, debtors Keith and Dawn Smith lived in a home in Joliet, Illinois. Title to the property passed to Dawn Smith in 2004 as an inheritance. The inheritance came encumbered, however. The real estate taxes for the property had gone unpaid in 2000, resulting in a tax lien.

In 2001, acting under state law, the county auctioned the tax lien on the residence (but not the residence itself). The tax lien was purchased by appellee SIPI, LLC, which paid the amount of the delinquent taxes—$4,046.26—as well as miscellaneous costs. Thus, for a little over $5,000, SIPI was awarded a Certificate of Purchase that entitled SIPI to a number of rights. Dawn Smith could redeem her tax obligation, but only by paying SIPI the outstanding taxes plus interest as determined at the tax sale. And if she failed to redeem, SIPI could begin the process of taking unencumbered title to the property.

In the vast majority of such tax sales in Illinois, the owner of the property or a mortgage lender redeems the property by paying the delinquent taxes plus applicable interest to the buyer of the tax lien. This was the rare case, however, in which no one redeemed the property.

SIPI therefore applied for, obtained, and recorded its tax deed with the county on April 15, 2005. A few months later, in August 2005, SIPI sold the property to appellee Midwest Capital Investments, LLC for $50,000, ten times SIPI's purchase price. Midwest became and remains holder of the record title to the property in fee simple.

On April 13, 2007, the Smiths filed for bankruptcy relief under Chapter 13. At the same time they filed an adversary complaint against SIPI and Midwest seeking to avoid the tax sale of their property as a fraudulent transfer. In an earlier appeal in this case, we held that the Smiths filed within the proper two-year window to challenge the sale. *In re Smith*, 614 F.3d 654, 660–61 (7th Cir. 2010). Upon remand, the bankruptcy court held a trial on the fraudulent transfer claim.

Bankruptcy Judge Black found that the Smiths had proven a fraudulent transfer because the property was not transferred for reasonably equivalent value. Analyzing the issue essentially as we do, he held that *BFP* does not apply to Illinois tax sales. The court limited the Smiths' recovery from SIPI to $15,000—the amount of one homestead exemption under Illinois law. The court also held in favor of Midwest on its defense to liability as a subsequent transferee in good faith.

On cross-appeals, the district court held that because the tax sale had complied with the requirements of state law, the reasoning of *BFP* applied so that the tax sale could not be set aside as a fraudulent transfer. The Smiths were entitled to no further recovery above the extinguishing of their $4,046.26 tax delinquency.

The Smiths have appealed to us. We review *de novo* the legal conclusions of the bankruptcy and district courts. *Freeland v. Enodis Corp.*, 540 F.3d 721, 729 (7th Cir. 2008). Like the district court, we defer to the factual findings of the bankruptcy court, which must stand unless they are clearly erroneous. *Id.*

We consider first the general question whether compliance with Illinois tax sale procedures protects the tax sale from the fraudulent transfer remedy under § 548(a)(1)(B). Our answer is no. We then address several case-specific issues, including the basis for the Smiths' standing, the proper amount of recovery, and finally the liability of Midwest.

II. *Fraudulent Transfers and Illinois Tax Sales*

States have a vital interest in collecting delinquent real estate taxes. See *BFP v. Resolution Trust Corp.*, 511 U.S. 531, 544 (1994). The outer limits of state law are prescribed by the federal Bankruptcy Code, which is intended to work in "peaceful

coexistence" with state procedures. See *id.* at 542; see also 1 Garrard Glenn, *Fraudulent Conveyances and Preferences*, ch. V(B), §§ 62, 62a (2d ed. 1940) (explaining early attempts to harmonize state law with longstanding fraudulent transfer principles). Our task is to harmonize the specifics of Illinois tax sale law with one provision of federal bankruptcy law— protection under § 548(a)(1)(B) against the fraudulent transfer of a debtor's property for less than reasonably equivalent value.

A. *Reasonably Equivalent Value*

Section 548(a)(1)(B) empowers a trustee to set aside a transfer of the debtor's property that occurred within two years before the bankruptcy petition was filed if the transfer amounted to either actual or constructive fraud. 11 U.S.C. § 548(a)(1)(B). And 11 U.S.C. § 522(h) allows a debtor to also set aside a fraudulent transfer if the trustee has not attempted to do so. The Smiths claim constructive fraud. The first requirement for constructive fraud, that the debtor either was insolvent on the date of the transfer or became insolvent as a result of the transfer, is not disputed. See 11 U.S.C. § 548(a)(1)(B)(ii)(I); see also *BFP*, 511 U.S. at 535. We focus here on the second requirement: that the debtor received "less than a reasonably equivalent value in exchange for such transfer." 11 U.S.C. § 548(a)(1)(B).

"Reasonably equivalent value" is not defined in § 548, but courts routinely make such determinations. See, e.g., *1756 W. Lake St. LLC v. American Chartered Bank*, 787 F.3d 383, 387 (7th Cir. 2015); *Barber v. Golden Seed Co.*, 129 F.3d 382, 387 (7th Cir. 1997) (§ 548 equivalence inquiry is not a fixed mathematical formula but depends on all the facts of each case; an important element is fair market value).

In mortgage foreclosure sales forced pursuant to state law, a special rule applies under § 548. In *BFP*, the Supreme Court held that where a foreclosure sale complied with the procedures of state law that allowed for competitive bidding for the value of the property, the sale could not be set aside under § 548 on the theory that the sale price was less than fair market value. 511 U.S. at 539–42. Instead, the sale price reached through the state-law process was conclusively deemed reasonably equivalent value. *Id.* at 545.

*BFP*'s special rule for "forced" mortgage foreclosure sales was not based on any textual clues in § 548 or other provisions of the bankruptcy laws. *Id.* It was based instead on practical concerns about how to let federal bankruptcy law work well with state mortgage foreclosure law. *Id.* at 544–45. The Court found that the "reasonably equivalent value" of a property was not necessarily the fair market value of the property. *Id.* at 537–38. Instead, a reasonably equivalent value for a foreclosed property "is the price in fact received at the foreclosure sale, so long as all the requirements of the State's foreclosure law have been complied with." *Id.* at 545.

The Court found that the standard market conditions required to make a "fair market value" determination simply do not apply in the forced sale context. *Id.* at 538. As the Court explained, a "fair market value" required a "fair market," with negotiations, mutual agreement, and lack of coercion. *Id.* A forced sale, conversely, changes these circumstances. "[P]roperty that *must* be sold within those strictures is simply *worth less.*" *Id.* at 539 (emphasis in original).

The *BFP* Court doubted that judges would be able to account accurately for the forced sale context in determining a hypothetical fair market value for property. *BFP* instructs that

this would require judges to make "policy determinations that the Bankruptcy Code gives … no apparent authority to make," especially since foreclosure systems are not uniform but vary considerably from state to state. 511 U.S. at 540.

In reasoning that figures prominently in this case, the Court also said that relying on a hypothetical fair market value to determine reasonably equivalent value could have the effect of unsettling an "essential state interest … in the security of the titles to real estate." *Id.* at 544, quoting *American Land Co. v. Zeiss*, 219 U.S. 47, 60 (1911). State foreclosure systems are designed to ensure security in title and efficiency in debt collection. *Id.* An interpretation of § 548 that would expand judicial inquiry into foreclosure sales could have the effect of invalidating more legitimate transfers under state law and putting real estate titles under a "federally created cloud." *Id.*

*BFP* was limited in scope, however. The Court took care to note that its decision "covers only mortgage foreclosures of real estate. The considerations bearing upon other foreclosures and forced sales (to satisfy tax liens, for example) may be different." *Id.* at 537 n.3. This is such a case, so we turn to those considerations now.

B. *The Illinois Tax Sale System*

States generally choose one of three methods for collecting delinquent property taxes: the overbid method, the interest rate method, and the percentage ownership method. Georgette C. Poindexter, Lizabethann Rogovoy & Susan Wachter, *Selling Municipal Property Tax Receivables: Economics, Privatization, and Public Policy in an Era of Urban Distress*, 30

Conn. L. Rev. 157, 174 (1997). This case requires us to compare the overbid and interest rate methods, so we focus on them.[1]

The overbid method is probably the auction system more familiar to most readers: the bidding price begins at the total amount of taxes and interest due, and potential buyers then offer higher bids up to the total price they are willing to pay in return for (eventual) fee simple title. See, e.g., Colo. Rev. Stat. Ann. § 39-11-115 (West 2015). The fair market value of the property is at least in theory the ceiling for amounts that might be bid. The winner of this competitive bidding receives rights to the property. See *In re Grandote Country Club Co.*, 252 F.3d 1146, 1152 (10th Cir. 2001) (explaining the competitive nature of the Colorado overbid system). A redemption period typically follows, during which the delinquent taxpayer or a mortgage lender may pay off the tax debt and reclaim the property. If the property is not redeemed, the winning bidder may bring an action for quiet title to the property. See, e.g., Colo. Rev. Stat. Ann. § 39-11-120 (West 2015).

The interest rate method used by Illinois is quite different. At the county tax auction, bidders vie to purchase the tax lien, not the property itself. They do so by bidding *down*. See *BCS Services, Inc. v. Heartwood 88, LLC*, 637 F.3d 750, 752–53 (7th Cir. 2011). Bids are expressed not as a total price for the property but rather as decreasing interest percentages. *Id.* These percentages are the penalty interest rates that the buyer may demand from the delinquent taxpayer (or mortgage lender)

---

[1] In the percentage ownership method, the "successful purchaser bids to purchase the tax lien for the lowest percentage ownership in the underlying property." Poindexter et al., *Selling Municipal Property Tax Receivables*, 30 Conn. L. Rev. at 174–75. For an example of Iowa's use of the percentage ownership method, see Iowa Code Ann. § 446.16 (West 2015).

to redeem the property. *Id.* In Illinois, the bids therefore work *down* from a statutory ceiling of eighteen percent. Zero percent is the floor. 35 Ill. Comp. Stat. 200/21-215 (2015).

Under this system, the *lowest* bidder wins and is granted the lien and a certificate of purchase. *In re LaMont*, 740 F.3d 397, 400–01 (7th Cir. 2014). And if the delinquent taxpayer and any mortgage lenders fail to redeem in the subsequent two years, the buyer takes the property free and clear. *Id.*, citing 35 Ill. Comp. Stat. 200/21-350 (2015).

In the vast majority of tax sales in Illinois, the penalty percentage paid by the winning bidder is zero percent. *BCS*, 637 F.3d at 752 (almost 85 percent of the winning bids). The purchase price of the property, taking into account the risk of redemption, is therefore usually nothing more than the sum of the delinquent taxes.

C. *The Limits of BFP*

Other circuits have extended the reasoning of *BFP* from the mortgage foreclosure context to tax sales using the overbid method. Here, we are asked to take the different step of extending *BFP* to Illinois's interest rate method as well. We decline to do so because of the fundamental differences between the overbid and interest rate methods.

Illinois's tax sale method is not designed to produce bids that could fairly be called "reasonably equivalent value." For the reasons explained, in an Illinois tax sale, there is "no correlation between the sale price and the value of the property." *In re McKeever*, 166 B.R. 648, 650–51 (Bankr. N.D. Ill. 1994).

Competitive bidding is limited to only the penalty interest rate on the lien. There is no bidding on what the bidder would be willing to pay for the property itself, as with the overbid

method. The Illinois sale method thus differs dramatically from the competitive bidding in *BFP*, which focused on "the context of [a] … sale of real estate," 511 U.S. at 537, not the delinquent taxes attached to the title. Using the overbid method, the fair market value acts as a cap for the auction, testing at least in theory who is willing to pay the most for title to the property. Using the interest rate method, zero percent acts as a floor for the bidding, to determine who is willing to accept the least in penalty interest. Bidding using the interest rate method thus bears no relationship to the value of the property itself.

The Smiths' case reflects these dynamics. The debtors received a value of $4,046.26, the amount needed to extinguish the tax delinquency. They surrendered a property worth somewhere between $50,000 (the amount Midwest paid SIPI) and $110,000 (an appraiser's opinion of the property value). A purchase price between 3.8% and 8.8% of fair market value is not reasonably equivalent to the value of the property.

Because of the critical differences between the overbid auction used in *BFP* and the interest rate method used in Illinois tax sales, we therefore agree with Judge Black of the bankruptcy court that *BFP* does not extend to Illinois tax sales. The bankruptcy court correctly found that the tax sale of the Smiths' residence amounted to a fraudulent transfer avoidable under § 548.

This holding is true to § 548 and the broader purposes of the Bankruptcy Code and its fraudulent transfer provisions to ensure both a fair distribution of the debtor's assets among creditors and a fresh start for the debtor. A central concern of federal bankruptcy law is "[e]quality of distribution among creditors," *Begier v. IRS*, 496 U.S. 53, 58 (1990), which lies at

the heart of fraudulent transfer law. 1 Glenn Garrard, *Fraudulent Conveyances and Preferences*, ch. I, § 1 (2d ed. 1940). If an insolvent debtor's asset worth between $50,000 and $110,000 can be transferred for about $5,000, a tax sale under the Illinois interest rate method can provide a windfall to one creditor at the expense of others. See Scott B. Ehrlich, *Avoidance of Foreclosure Sales as Fraudulent Conveyances: Accommodating State and Federal Objectives*, 71 Va. L. Rev. 933, 935–36 (1985) (noting, in foreclosure context, that § 548 helps to protect against "an estate-depleting windfall to the purchaser at the expense of the debtor's creditors"); *id.* at 951–52 (§ 548 calls for an "inquiry into the adverse impact on the general creditors"); cf. *BFP*, 511 U.S. at 562–65 (Souter, J., dissenting) (noting that avoiding transfer of foreclosure properties for low prices "is plainly consistent" with policy of "maximum and equitable distribution for creditors … at the core of federal bankruptcy law"). Fraudulent transfer remedies can also help provide a fresh start to debtors, at least in circumstances like this where the fraud is constructive. See *Wetmore v. Markoe*, 196 U.S. 68, 77 (1904); see also *Local Loan Co. v. Hunt*, 292 U.S. 234, 244 (1934) (purpose of bankruptcy law to permit debtor "to start afresh"), quoting *Williams v. U.S. Fidelity & Guaranty Co.*, 236 U.S. 549, 554, 555 (1915).

The strongest argument against our conclusion is based on the language in *BFP* on the need for stability and certainty in real estate titles and the fear of putting titles to properties bought in foreclosure sales "under a federally created cloud." 511 U.S. at 544–45. The district court focused on this policy consideration in deciding that the reasoning of *BFP* should extend to Illinois tax sales using the interest rate bidding sys-

tem. Appellees endorse this reasoning and warn that apply-ing the general rule of § 548 to tax sales will "wreak havoc" with Illinois's system for collecting delinquent property taxes.

We are not persuaded. First, we read *BFP* as depending not on a general concern about the stability of real estate transactions but on the central role of competitive bidding in an auction for the value of the property itself. The Court's opinion recognized the special circumstances of foreclosure sales, where the property must be sold for the highest bid, but the competitive bidding in foreclosure sales is based directly on the value of the underlying property. That simply is not true under the interest rate bidding system for Illinois tax sales.

Second, any fraudulent transfer remedy necessarily im-poses some degree of uncertainty on all transfers of property, including real estate. The general rule of § 548 does so for all transfers of property. While *BFP* provided a special exception for foreclosure sales using auctions based on the value of the property, the general rule remains for essentially all other sorts of transfers of property, including property tax sales.

Third, the uncertainty is for a limited period of time, here, two years after the transfer. The tax sale process in Illinois al-ready builds in significant delays through the time during which redemption is allowed. At the margins, applying § 548 to tax sales using the interest rate bidding system may reduce the already slim chances that a tax buyer will end up walking off with the fee simple title in return for having paid only the delinquent taxes. Those chances remain greater than zero, though. Tax buyers will still have incentives to bid, even though their incentives might lead them to bid a little more

than zero percent to offset the diminished chances of a fee-simple windfall.

Additional protection is provided by § 550 of the Bankruptcy Code. A good faith transferee is granted a lien on the property for any improvements made and any resulting increase in property value. 11 U.S.C. § 550(e). And a subsequent good faith transferee who takes the property without knowledge of the fraudulent nature of the transfer is shielded from liability, as discussed below regarding defendant Midwest. See 11 U.S.C. § 550(b).

While applying § 548 may make purchases of Illinois tax liens marginally less attractive as investments, federal law mandates this result. We must enforce the federal bankruptcy remedy for fraudulent transfers where the reasoning of *BFP* does not apply, based on fundamental differences between the auction systems used in that case and this one. We agree with Judge Black that allowing application of § 548 to Illinois tax sales best heeds the challenge to interpret the Bankruptcy Code "in harmony with the 'state-law regulatory background.'" *Smith v. SIPI, LLC*, 526 B.R. 737, 743–44 (Bankr. N.D. Ill. 2014), quoting *BFP*, 511 U.S. at 539–40.

Accordingly, we apply to Illinois tax sales the same factors used to determine reasonably equivalent value in other § 548 cases, including the fair market value of what was transferred and received, whether the transaction took place at arm's length, and the good faith of the transferee. *Barber v. Golden Seed Co.*, 129 F.3d 382, 387 (7th Cir. 1997); see also *In re Williams*, 473 B.R. 307, 313 (Bankr. E.D. Wis. 2012) (holding, in applying *Barber* factors, that a transfer was not for reasonably equivalent value), vacated on other grounds by *City of Mil-*

*waukee v. Gillespie*, 487 B.R. 916, 920–21 (E.D. Wis. 2013) (agreeing with application of *Barber* factors); *In re Eckert*, 388 B.R. 813, 835 (Bankr. N.D. Ill. 2008). The bankruptcy court correctly applied this approach, and we therefore affirm its holding that the transfer of the Smiths' property to SIPI for approximately $5,000 was not for reasonably equivalent value.

### D. *Other Circuits' Approaches*

In reaching our decision, we note the different approaches taken by the Fifth and Tenth Circuits in other tax sale cases that differ from this one because of the different bidding systems used. Both circuits have held that *BFP* applies to the issue of reasonably equivalent value in Oklahoma and Colorado tax sales using the overbid method. *In re Grandote Country Club Co.*, 252 F.3d 1146, 1152 (10th Cir. 2001); *T.F. Stone Co. v. Harper*, 72 F.3d 466, 471 (5th Cir. 1995). Both decisions were based on the particular state systems at issue, just as ours is here.

The overbid systems in both Oklahoma and Colorado use competitive bidding won by the highest bidder, similar to the bidding used in the foreclosure sale in *BFP*. Delinquent property is sold at an auction in which the sale price may rise well above the amount of the tax lien, toward the fair market value of the property subject to the forced sale. Accordingly, "deference to state regulatory interests" may warrant the application of *BFP* to those systems, as those courts held. See *T.F. Stone*, 72 F.3d at 472. Sale prices, by the very design of the overbid method, are likely to generate bids more reasonably equivalent to the value of the underlying property.

The Tenth Circuit took care to explain the narrow scope of its holding. It noted that "courts have not been unanimous in

extending *BFP* to the tax sale context." *Grandote*, 252 F.3d at 1152. Critically, "the decisive factor in determining whether a transfer pursuant to a tax sale constitutes 'reasonably equivalent value' is a state's procedure for tax sales, in particular, statutes requiring that tax sales take place publicly under a competitive bidding procedure." *Id.* We have already explained why the Illinois interest rate method for tax sales is not similarly designed to produce higher bids approaching the value of the underlying property.

To make the point clear, *Grandote* went on to distinguish its ruling based on the Colorado "competitive bidding procedure," from a similar case from Wyoming, which did not require a public auction or competitive bidding. *Id.*, citing *Sherman v. Rose*, 223 B.R. 555, 558–59 (B.A.P. 10th Cir. 1998), citing Wyo. Stat. Ann. § 39-3-105 (1998) (before relevant provision was repealed by statute, Wyoming property subject to tax lien was sold by random lottery for amount of delinquent taxes). The Tenth Circuit therefore limited its holding to Colorado's particular overbid system. *Grandote*, 252 F.3d at 1152. And it left in place the earlier holding of a bankruptcy appellate panel in *Sherman* that a property sold for one percent of its appraised value under Wyoming's old lottery tax sale system had not been sold for reasonably equivalent value. *Id.*, citing *Sherman*, 223 B.R. at 559. Our decision is similarly based on the differences between various state tax sale procedures and therefore applies only to the interest-rate bidding system under Illinois law.

III. *Additional Issues*

We now turn to several more case-specific issues. First is the logically prior question of whether the Smiths have standing to bring the meritorious claim for fraudulent conveyance.

Second is the proper amount of recovery under Illinois homestead exemption law. Finally, we consider the affirmative defenses of SIPI and Midwest.

A. *Standing*

Chapter 13 grants debtors "possession of the estate's property," which includes legal interests and the right to bring "legal claims that could be prosecuted for benefit of the estate." *Cable v. Ivy Tech State College*, 200 F.3d 467, 472–73 (7th Cir. 1999), overruled on other grounds by *Hill v. Tangherlini*, 724 F.3d 965, 967 n.1 (7th Cir. 2013). The debtors thus have standing to bring this claim to avoid the fraudulent transfer. This determination is complicated a bit by the Smiths' intervening divorce, but those details should not obscure a straightforward legal result.

Dawn Smith inherited the property in 2004 and therefore was the sole holder of record title. When both Dawn and Keith initially brought their claim before the bankruptcy court in 2012, only Dawn's claim was allowed to proceed. Keith, having no property interest, seemed not to have standing to assert this claim, or at least not to be a real party in interest. It was later revealed, however, that the Smiths had filed for and been granted a divorce in December 2011. The divorce decree granted Keith exclusive rights to the property in question. This revelation arose after discovery in the bankruptcy court had begun but before judgment was entered.

The Smiths agreed to determine their respective entitlements to any recovery in state court, removing the need for the bankruptcy court to decide whether and how to divide the recovery between Dawn and Keith. Likewise, we need decide

only whether either or both of the Smiths could bring this claim.

Keith Smith has standing to assert the fraudulent transfer claim based on his property interest granted in the divorce judgment. His agreement to resolve in the state divorce court the precise split of any potential recovery with Dawn Smith did not change the fact that he has a concrete interest in this case. The bankruptcy court did not err by reinstating him as a co-plaintiff in the fraudulent transfer action.

Dawn Smith also has standing. She arguably still has an interest in the outcome of the litigation by way of her agreement with Keith Smith to settle their potential recovery in state court. And even if the divorce judgment divested Dawn of any interest in the property or recovery, she may still bring this case under the rules of substitution of parties. See Fed. R. Civ. P. 25(c) ("If an interest is transferred, the action may be continued by … the original party … ."); Fed. R. Bankr. P. 7025.

In any event, we are confident that the bankruptcy and district courts were correct to allow Dawn Smith to pursue this case as a co-plaintiff. We reject SIPI's argument that neither of the Smiths has standing.[2]

_____

[2] As SIPI views the issue, Dawn used to have standing and Keith did not. The divorce judgment then left Dawn with no property interest. Under SIPI's theory, the rather simple procedural device of reinstating Keith as a proper plaintiff would unsettle the "law of the case," i.e., that Keith did not have standing. The result of this line of thinking, which misunderstands the idea of the law of the case, would be that the private arrangements between Dawn and Keith as part of their divorce had the improbable result of preventing either one from asserting a meritorious claim for fraudulent transfer.

B.  *Amount of Recovery*

Having determined that the transfer of the Smiths' residence was constructively fraudulent and that the Smiths have standing to assert this claim, we turn to the amount they may recover. The bankruptcy court held that the Smiths were entitled to $15,000—the amount of one homestead exemption under Illinois law. The Smiths argue for a larger recovery, but we agree with the bankruptcy court.

We begin with the Schedule C filed by the Smiths as part of their bankruptcy petition. Originally, the Smiths claimed one homestead exemption, in the amount of $15,000, reflecting Dawn Smith's interest in the property as the owner in fee simple. Over six years later, after the bankruptcy court had issued its decision, the Smiths filed an amended Schedule C, this time listing homestead exemptions for Dawn Smith, Keith Smith, and their four minor children. The Smiths now argue for a seventh exemption, for Dawn's cousin, a minor in the custody of the Smiths. In all, the Smiths ask for $105,000 (7 x $15,000) in aggregate homestead exemptions.

The Illinois homestead exemption statute provides:

> Every individual is entitled to an estate of homestead to the extent in value of $15,000 of his or her interest in a farm or lot of land and buildings thereon, a condominium, or personal property, owned or rightly possessed by lease or otherwise and occupied by him or her as a residence, or in a cooperative that owns property that the individual uses as a residence. … If 2 or more individuals own property that is exempt as a homestead, the value of the exemption of

> each individual may not exceed his or her pro-
> portionate share of $30,000 based upon percent-
> age of ownership.

735 Ill. Comp. Stat. 5/12-901 (2015). For purposes of argument, we assume that the Smiths properly and timely claimed all seven homestead exemptions they now seek, so the procedural propriety of the later-filed exemption claims does not matter. The Smiths still receive precisely the number of exemptions based on their amended filings and subsequent pleading that they would under their original Schedule C: one.

First, the four minor children of the Smiths, as well as the minor cousin, are not eligible for separate, independent homestead exemptions. Illinois law is clear that the homestead exemption requires that an individual "owned or rightly possessed by lease" the delinquent property. We have suggested that "titled interest is required to sustain a homestead estate." *In re Belcher*, 551 F.3d 688, 691 (7th Cir. 2008), citing *De Martini v. De Martini*, 52 N.E.2d 138, 142 (Ill. 1943) ("The right of homestead … can have no separate existence apart from the title on which it depends."); *First Nat'l Bank & Trust Co. v. Sandifer*, 258 N.E.2d 35, 37 (Ill. App. 1970) (noting that a homestead exemption requires "Some title, no matter what its extent"). Debtors do not allege, nor could they, that the five children had title to the property.[3]

---

[3] The Smiths point to a concurring opinion in *First Nat'l Bank of Moline v. Mohr*, in which Justice Heiple mused that a ten-member household might well be entitled to an aggregate of ten homestead exemptions. 515 N.E.2d 1356, 1359 (Ill. App. 1987) (Heiple, J., concurring). But the 1994 amendments by the Illinois General Assembly added an explicit ownership requirement to the state homestead statute. See *Belcher*, 551 F.3d at

And though it is a closer issue, the Smiths may not claim two separate homestead exemptions on behalf of both Dawn and Keith Smith. As noted, title is required to support a homestead exemption. We have held this to be no less true for married couples where only one spouse has title to non-marital property. *Belcher*, 551 F.3d at 690–93. Whether or not an individual has title to property is measured at the time of the bankruptcy filing. *Id.* at 690. And, in April 2007 when the Smiths filed their bankruptcy petition, only Dawn had title by virtue of her inheritance.

We have recognized limited exceptions to this rule in the cases of married couples where only one spouse has listed title in the marital home. First, a divorced spouse at the time of the bankruptcy filing may have a potential interest in the family home despite a lack of title if the land was marital property. *Id.*, citing 750 Ill. Comp. Stat. 5/503(b)(1) (2015). (This, of course, does not extend to property acquired during the marriage by way of "gift, legacy or descent." 750 Ill. Comp. Stat. 5/503(a) (2015).) Second, a surviving spouse may be able to claim an interest where the titled spouse dies before the bankruptcy filing. *Belcher*, 551 F.3d at 691.

But where, as here, the spouses were "still married and alive at the time they filed the petition for bankruptcy," the exceptions do not apply and title controls the eligibility for homestead exemptions. *Id.* Dawn received the property by "gift, legacy or descent" and had sole title. Accordingly, the

---

692, citing Act of Dec. 14, 1994, Pub. Act No. 88-672, § 25, 1994 Ill. Laws 2649. We noted in *Belcher* that the speculation in the *Mohr* concurrence about homestead-by-possession was blocked by the 1994 amendments. *Id*. That door remains shut.

exceptions provide no support for an additional homestead exemption for the Smiths.

The fact that Keith later took title does not change the analysis. The homestead inquiry depends on the time of the filing. The "*future* or *potential* equitable interest" of a non-titled spouse is not sufficient to establish the formal title anticipated by Illinois exemption law. *Id.* (emphasis in original).

The Smiths also make an alternative argument that as both debtors and debtors in possession, they are both entitled to full trustee powers. Accordingly, they contend that they may set aside the transfer and are not bound by any limitations imposed by homestead exemptions. Rather, the Smiths seek to recover the entire amount of the value of their property.

We believe this argument misunderstands a key distinction between a debtor's power acting in place of a trustee to avoid a transfer and the entitlement to and amount of a debtor's recovery. It is true that the Smiths as debtors have the power to avoid the transfer just as their trustee would. See 11 U.S.C. § 522(h). As the bankruptcy court explained, where a transfer is avoidable under § 548 but the trustee does not attempt to avoid it (which the bankruptcy court found was the case here), the debtors themselves may avoid the transfer.

But the power to avoid is only the power to unwind the transfer. No authority would allow the Smiths themselves to recover the full value of the property simply because they can avoid the tax sale. The homestead exemption provides a safe haven for *some* recovery for parties in the Smiths' position. But any additional recovery would be for the benefit of the Smiths' estate and therefore for their other creditors.

The only authority the Smiths cite to support their claim for the entire value of the property is a footnote from *In re Einoder*, 55 B.R. 319, 322 n.8 (Bankr. N.D. Ill. 1985). The Smiths contend that this footnote establishes that recovery is not limited to the amount of their exemptions, a proposition they claim was later adopted in *Gray-Mapp v. Sherman*, 100 F. Supp. 2d 810, 812 (N.D. Ill. 1999).

The *Einoder* footnote said no such thing. Rather, it explained the ability of debtors to pursue Chapter 13 litigation in place of their trustees and later to collect the full value of their homestead exemption. 55 B.R. at 322 n.8 ("If the trustee has the power to help the debtors, they ought to be able to use that power to help themselves."). The *Einoder* footnote recognized that § 522(h) empowers debtors to bring avoidance actions but did nothing to displace exemption law. *Gray-Mapp* said nothing to the contrary. See 100 F. Supp. 2d at 812 (determining that a debtor has "standing to bring this claim" in place of trustee). *Einoder* went on to apply the homestead exemption to the debtors. 55 B.R. at 325–26 ("[D]ebtors can nevertheless avoid the Bank's lien under § 522(f)(1), at least to the extent it impairs their joint homestead exemption.").

Accordingly, the bankruptcy court was correct to award the Smiths precisely what they asked for in the first place: one homestead exemption for $15,000.

C.  *Liability of SIPI*

Once a transfer is avoided as fraudulent, the Bankruptcy Code assigns the liability of the transferees under § 550. It divides transferees into two categories: the "initial transferee" under § 550(a)(1) and "any immediate or mediate transferee" under § 550(a)(2). 11 U.S.C. § 550.

A transferee is one who exercises "dominion over the money or other asset, the right to put the [asset] to one's own purposes." *Bonded Financial Services v. European American Bank*, 838 F.2d 890, 893 (7th Cir. 1988). Accordingly, while an agent of a third party acting as an intermediary may not be a transferee, an entity that takes title or otherwise possesses the asset certainly is. *Id.* ("When A gives a check to B as agent for C, then C is the 'initial transferee'; the agent may be disregarded.").

The initial transferee, then, is simply the first transferee in the chain of title. And unlike an immediate or mediate transferee, the initial transferee has no defense against liability under § 550.

The bankruptcy court correctly treated SIPI as the initial transferee and therefore liable to the Smiths. As the tax buyer, SIPI bought the tax lien at the tax sale, was awarded control over the tax lien, and then applied for and received title to the property in the transfer that was constructively fraudulent and thus avoidable.

SIPI makes two arguments against this conclusion. First, it asserts that Congress, in enacting § 550(a)(1), could never have meant it to apply to tax buyers like SIPI because that would render tax deeds unmerchantable and remove all incentives for tax buyers to purchase liens. This argument lacks a textual basis in the statute and overstates the consequences of this decision. This argument presents essentially the same concerns we addressed earlier in determining that applying § 548 to Illinois tax sales should not wreak havoc on Illinois tax sales. Under § 548, a transfer may be avoided only within a narrow two-year window, and only if the debtor was insolvent and the conveyance was not for reasonably equivalent

value. An Illinois tax deed should remain an attractive invest-
ment even though it will remain contingent for two more
years.

SIPI also argues it was not the initial transferee because the
county was technically the first to take title to the property so
that the county was the initial transferee and SIPI a subse-
quent transferee entitled to assert a defense. In support, it
cites the Fifth Circuit's decision in *T.F. Stone* where the county
was determined to have taken title to property subject to an
Oklahoma tax sale before it was later transferred. 72 F.3d at
471.

This argument does not work in this Illinois case. Under
Illinois law, the county acts as a facilitator of the tax sale to
fulfill the delinquency judgment. The county collector merely
"offer[s] the property for sale pursuant to the judgment." 35
Ill. Comp. Stat. 200/21-190 (2015). At no point in this transac-
tion does the county take title. The "purchaser" of the prop-
erty is the bidder at the sale offering to pay the amount due at
the lowest penalty percentage interest. 35 Ill. Comp. Stat.
200/21-215 (2015). Here, that was SIPI.

At best, the county was an agent in the transfer of the
property between the Smiths and SIPI much in the way that,
in *Bonded Financial*, European American Bank was the inter-
mediate agent between Michael Ryan and Bonded Financial
Services. 838 F.2d at 893. As in that case, the county as agent
never exercised dominion over the debtors' property. "In the
case of an involuntary transfer of real estate through the tax
sale procedure [in Illinois], the State is more like a conduit
than a transferee." *In re Butler*, 171 B.R. 321, 327 (Bankr. N.D.

Ill. 1994). The county has "no ownership rights in the property," and is therefore "never a transferee." *Id.* at 328. We agree with that interpretation of Illinois law.

SIPI's view that the county was the initial transferee would produce improbable results. In all tax sales, the county would become the initial transferee, which would render the county, which recognized no profit from the transaction other than collecting delinquent property taxes, always liable for a constructively fraudulent transfer. And it would mean that tax buyers like SIPI—assuming they purchased in good faith— could capture substantial profits from the sales shielded from recovery by the debtor.

SIPI's reliance on *T.F. Stone* is not persuasive. As explained above, that decision depended on an entirely different Oklahoma tax sale method. But even setting that aside, SIPI misreads the opinion. In *T.F. Stone*, Bryan County "was forced to take title" at the original sale "because there were *no bids* on the Oklahoma property." *T.F. Stone Co. v. Harper*, 72 F.3d 466, 471 (5th Cir. 1995) (emphasis in original). The Fifth Circuit never suggested that the county took title before the transfer to the bidder. In this case there were bids for the Smiths' property, and SIPI came out the victor.

D.  *Liability of Midwest*

We turn finally to appellee Midwest. As the eventual recipient of the property by way of a transfer from SIPI—the initial transferee—Midwest was the immediate subsequent transferee under § 550(a)(2).

A subsequent transferee may present a defense under § 550(b)(a) by showing that it took the property for value, in good faith, and without knowledge of the voidability of the

transfer. As we explained in *Bonded Financial*, § 550(b) makes the policy decision to leave "with the initial transferee the burden of inquiry and the risk if the conveyance is fraudulent." 838 F.2d at 892. The subsequent transferee, conversely, is relieved of the responsibility to affirmatively monitor the initial transfer.

For purposes of § 550(b), there is little difference between "good faith" and "without knowledge of the voidability of the transfer." *Id.* at 897; 5 Collier on Bankruptcy ¶ 550.03[3], at 550-28 (16th ed.) (noting that knowledge requirement is "surplusage to illustrate a transferee that could not be in good faith"). In combination, the two terms require that when "facts strongly suggest the presence of" other facts demonstrating fraud, "a recipient that closes its eyes to the remaining facts may not deny knowledge." *Bonded Financial*, 838 F.2d at 898.

To be clear, "this is not the same as a duty to investigate." *Id.* Knowledge is a higher bar than inquiry notice. A subsequent transferee need not conduct extensive research into the chain of title of the property or pore through the financial statements of the debtor. *Id.*; *In re Equipment Acquisition Resources, Inc.*, 803 F.3d 835, 840 (7th Cir. 2015) ("If a reasonable inquiry would not have led to actual knowledge of voidability, a court cannot impute knowledge."). Section 550(a) places the burden to investigate on the initial transferee. Section 550(b) is designed instead to ensure that a subsequent transferee with affirmative knowledge of a voidable transfer does not then quickly convey that property to an innocent third party to "wash" the transaction. *Bonded Financial*, 838 F.2d at 897, quoting H.R. Rep. No. 95-595, 95th Cong., 2d Sess. 376 (1978).

Because § 550(b) offers an affirmative defense, Midwest bore the burden of persuasion on the defense. *In re Commercial Loan Corp.*, 396 B.R. 730, 743 (Bankr. N.D. Ill. 2008). The bankruptcy court here determined after a trial that Midwest proved the elements of its defense, particularly that it took in good faith and without knowledge. A determination of good faith in a bankruptcy matter is a finding of fact; we review it only for clear error. See *Hower v. Molding Systems Engineering Corp.*, 445 F.3d 935, 938 (7th Cir. 2006); *In re Smith*, 286 F.3d 461, 465–66 (7th Cir. 2002).

The bankruptcy court did not clearly err in its determination that Midwest proved its good faith and lack of knowledge under § 550(b). For Midwest to have had knowledge of the voidability of the transfer, it needed to have had some knowledge of a potential fraudulent conveyance: either that the Smiths were insolvent, or that the transfer was for less than reasonably equivalent value. The evidence at trial did not require the bankruptcy court to reject the defense.

The Smiths filed for bankruptcy well after both the initial transfer to SIPI and the later transfer to Midwest. Upon acquiring the property, Midwest thus had no affirmative knowledge of the insolvency of the Smiths.

Nor did the evidence require the bankruptcy court to find that Midwest knew the initial transfer was for less than reasonably equivalent value. At best, it knew that there was a tax deed in the chain of title, but the bankruptcy court did not clearly err by finding that was not enough to defeat Midwest's defense. As we hope we have made clear, not every tax sale is necessarily for less than reasonably equivalent value.

Further, the evidence did not compel a finding that Midwest intended in bad faith to collude with SIPI or subsequently to wash the property through a third party. There was evidence at trial that Midwest bought the property in an arm's length transaction after a lengthy negotiation with SIPI. Midwest bought the parcel as a rental property, not as an opportunity to launder the title quickly through another buyer. There were inspections of the property and review of title and the issuance of a warranty deed from SIPI. And Midwest, at the time of the bankruptcy court's decision, remained holder of record title.

We reject the Smiths' argument that the bankruptcy court was required to find that Midwest knew the transfer was avoidable simply because of the presence of a tax deed or because this was an occupied residence. We defer for a future case the issue of whether a bankruptcy court could have found knowledge of voidability or bad faith on a similar record.

*   *   *

To conclude, a tax sale lawfully conducted according to Illinois's interest rate auction system does not necessarily establish a transfer for reasonably equivalent value within the meaning of 11 U.S.C. § 548(a)(1)(B). The bankruptcy court correctly conducted a more substantive analysis of the fair market value of the property and other factors to determine that the Smiths' property was fraudulently conveyed. The debtors have standing to assert the claim; the bankruptcy court properly set the debtors' recovery at the value of one homestead exemption; SIPI is liable as the initial transferee; and the bankruptcy court did not err by finding that Midwest proved

its defense to liability under 11 U.S.C. § 550(a)(2). Accordingly, the judgment of the district court is REVERSED and the judgment of the bankruptcy court is AFFIRMED in all respects.